IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Evillo Domingo, et al.,                              Case No. 3:13 CV 94

                          Plaintiffs,              MEMORANDUM OPINION
                                                  AND ORDER

          -vs-
                                                  JUDGE JACK ZOUHARY
Marsha Kowalski, et al.,

                          Defendants.

## INTRODUCTION

In this action, Plaintiffs, four developmentally disabled children ("Plaintiff Children") and their parents ("Plaintiff Parents") (Doc. 1-1 at ¶ 1), bring federal and state-law claims against two groups of Defendants: (1) the Plaintiff Children's teacher during the 2003-04 school year, Marsha Kowalski ("Kowalski"), (2) North Point, the regional educational service center that employed Kowalski, and four North Point administrators (collectively, "North Point Defendants").  Plaintiffs allege each Defendant contributed to the mistreatment of the "nonverbal, severally autistic" Plaintiff Children (Doc. 90 at ¶ 27).

Kowalski and the North Point Defendants separately moved for summary judgment (Docs. 99 & 100), which Plaintiffs opposed (Docs. 112 & 114).  Defendants replied (Docs. 123 & 132). *See also* Docs. 108 & 120.  For these Motions, the parties have stipulated to certain facts (Docs. 90 & 107).

For the reasons that follow, Defendants' Motions are granted in part and denied in part as moot.  Defendants are entitled to judgment as a matter of law on all federal claims.  This Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims, which are remanded to the Erie County Court of Common Pleas.

## BACKGROUND

### The Parties

During the 2003-04 school year, Kowalski was a special education teacher employed by North Point, an "educational service center that . . . contracted" with three Northwest Ohio school districts "to provide special education" services for developmentally-disabled children within each of the school districts (Doc 90 at ¶¶ 2–3, 16). North Point, in turn, contracted with the Norwalk Assembly of God ("the Church") to lease space for Kowalski's classroom (¶ 25). Nonparties Laurie Fogg ("Fogg") and Suzanne Brant ("Brant") were Kowalski's teacher aides (¶ 23).

Defendant Karen Streng ("Streng") was the Special Education Supervisor and Kowalski's immediate superior (¶¶ 13, 18). Defendant Charlotte Wagner ("Wagner") was North Point's Executive Director for Huron County, a role in which she liased with "local school district boards of education, superintendents[,] and administrators" (¶¶ 10–11). Defendant Daniel McCarthy ("McCarthy") was North Point's Executive Director for Erie County and Assistant to North Point Superintendent, Defendant William Lally ("Lally") (¶¶ 8–9).

The Plaintiff Children were students in Kowalski's classroom. J.F. was then a nine-year-old male autistic child with multiple disabilities, including speech apraxia (¶¶ 33, 38). J.J. was then an eleven-year-old female autistic child with multiple disabilities, including cerebral palsy (¶ 41). R.G. was then a nine-year-old male autistic child (¶ 43). And N.D. was then a six-year-old female autistic child (¶¶ 45–46). Each child was nonverbal (¶ 27).

### Kowalski, Fogg, and Brant begin the 2003-04 School Year

Kowalski and Fogg had been paired together as teacher and teacher's aide (or, at an earlier point in Fogg's career, one-on-one aide) since Fogg joined North Point in 1996 (Doc. 94, Fogg Dep. at 47–49). Until Summer 2003, Kowalski and Brant taught a North Point class housed in Shawnee

Elementary (*id.* at 47, 49; Doc. 91, Kowalski Dep. at 36).  Throughout Kowalski and Fogg's time together, the two taught intellectually disabled children, including autistic children (Fogg Dep. at 50, 52).  Kowalski was certified to teach "severely/moderately/profoundly [intellectually-disabled] children from ages K through 12" (Kowalski Dep. at 41–42).

The 2003-04 school term brought three relevant changes to Kowalski's classroom.  First, prior to that school year, Kowalski had been a preschool teacher (*see, e.g.*, Doc. 99-3 at 230–32).  Then he became a "primary teacher," teaching slightly older children (*id.* at 228–29).

Second, Kowalski and Fogg left Shawnee Elementary.  North Point "depend[s] on [its] client districts" for classroom space -- it does not own space for classrooms (Doc. 95, Lally Dep. at 53).  In the fall of each school year, Lally would ask client school district superintendents whether existing North Point classrooms, owned by the client school districts, would be reclaimed by that school district the following school year (*id.* at 53–54).  During the 2002-03 school year, North Point learned that neither Erie nor Huron nor Ottawa County school districts had space for Kowalski's class.  Therefore, on the recommendation of former North Point employee Lynn Cole, North Point leased space for Kowalski's classroom at the Church (*id.* at 55).

Third, Brant joined Kowalski's classroom as J.F.'s one-on-one aide.  North Point hired Brant in 1999.  Brant had no prior educational training (Doc. 92, Brant Dep. at 5–6, 8–9).  After stints at two other North Point classrooms, Brant became an educational assistant in a North Point classroom at Furry Elementary.  There, she worked for the first time with autistic children, becoming J.F.'s one-on-one aide.  Brant felt she "didn't know anything about autism," and did not enjoy her assignment at Furry (*id.* at 10).  *See also id.* at 32, 38–39 (Brant explaining she previously worked with only behaviorally challenged junior high and high school children).  After a brief period at Pleasant Street School, J.F. transferred to Kowalski's classroom in Fall 2003, bringing Brant with him (*id.* at 11–12).

3

Brant remained "primarily assigned to work one-on-one with J.F. in Kowalski's classroom"(Doc. 90 at ¶ 30; Brant Dep. at 94).

At the Church, Kowalski, Fogg, and Brant were current on their Ohio Department of Education-mandated ("ODE") child abuse training (Doc. 90 at ¶¶ 22–24).  Streng conducted the training sessions, which lasted "[p]robably five minutes[,]" at staff in-service sessions prior to the start of every other school year (Doc. 97, Streng Dep. at 77).  Streng "count[ed] a lot on [her] tone of voice and [her] expression" to explain the North Point staff's reporting obligations (*id*.).

North Point's Child Abuse Policy, included in the Employee Handbook distributed at the start of the school year, read in part (Doc. 107-2 at 2) (emphasis in original):

> *Staff members who know or suspect that a child, under nineteen (19), or a physically, developmentally, or mentally handicapped child under age twenty-one (21), has been abused or neglected must immediately report that knowledge or suspicion to Children's Services or local law enforcement.  Failure to follow this directive is a violation of state law and could result in criminal charges and the loss of one's certificate/license.*

The Child Abuse Policy is substantially similar to the then-existing text of the relevant Ohio statute.  *See* R.C. § 2151.421(A)(1)(a) (West 2004) (quoted in Doc. 100 at 2).  The Child Abuse Policy provided illustrative examples of abuse, and instructed the reporting employee to not inform the alleged abuser that a report had been made (Doc. 107-2 at 2).

North Point also had in place a Concerns Resolution Policy, which advised employees how to lodge complaints against co-workers.  Under that policy, "[a]n employee who has a complaint should address [the complaint] with their immediate supervisor," who then attempts to resolve the complaint (*id*. at 3).  If the complaining employee's immediate supervisor does not resolve the complaint, the complaint is referred to the relevant executive director, and then to the Superintendent.  "*Staff members are encouraged to resolve issues at the lowest level possible.  Staff members with*

4

*questions should respect common work decorum and wait for an appropriate time to address those issues with the appropriate individual*" (*id*.) (emphasis in original). An employee who makes a meritless complaint can be disciplined, even fired (*id*.). Provisions of the Concerns Resolution Policy "*will be waived when [they] conflict[ ]*" with federal, state, or local law, or with ODE guidelines (*id*.) (emphasis in original).

### Brant Complains to Streng in November 2003 and March 2004

On November 6, 2003 (Doc. 90 at ¶¶ 71–75), Streng and Wagner visited the Church. Brant had called Streng at home the prior evening, informing Streng that Kowalski had a doctor's appointment the next morning. Rather than formally request time-off, Kowalski asked Fogg to cover for her without informing North Point (Streng Dep. at 84). Brant "did not think this was right," and worried that because of Kowalski's absence "there [would be] no certified teacher in the [class]room" (*id*.). Brant's concern was valid; North Point issued Kowalski a letter of reprimand for the attendance issue (*id*. at 85).

While Streng and Brant awaited Kowalski's return from the doctor's office, Brant shared concerns with Streng about J.F.'s toilet training. J.F. used a Rifton chair, which is "similar to a high chair" equipped with a tray, straps, and "a removable seat which could convert into a chair used for toileting" (Doc. 90 at ¶ 35). The Rifton chair also was used "for trunk stability," or as an "educational tool for students [who] have difficulty functioning in large space" (Streng Dep. at 78). Record evidence suggests Rifton chairs should not be used to restrain autistic children (*see* Doc. 112-2 at 19).

Brant told Streng that Kowalski "was keeping [J.F.] on the Rifton toilet seat sometime[s] for 40 minutes" (Doc. 92, Brant Dep. Exh. J, at 285). In particular, Brant told of an incident in which Kowalski left J.F. "sobbing" in the dark in the bathroom on the Rifton potty chair. As Brant recounted the event, she "was out on the playground with the kids, [and] Marsha said she would stay

back [inside] for whatever reason with [J.F.]."  After some time, Brant returned to the classroom and asked Kowalski about J.F. "[A]nd she said he's in the [boy's] bathroom."  The door to the boy's bathroom was closed.  Brant "went in the bathroom and she [saw Kowalski] had [J.F.] in a Rifton [potty chair.]"  Kowalski had attached the Rifton potty chair to the bathroom stall, so that J.F.'s feet did not touch the ground (Brant Dep. at 14).  "He was restrained" (*id*. at 46–47).  Kowalski left J.F. alone in the bathroom, "with the water running and the lights off[,] causing [J.F.] to cry" (*id*. at 92).

Streng and Wagner claim they told Brant that if Brant suspected Kowalski was abusing or neglecting a child, she should call children's services.  Brant allegedly responded she would make the call from home (Doc. 92, Brant Dep. Exhs. I & J, 284–85).  Brant admits she did not call children's services after Streng and Wagner's November 2003 visit.  Brant cannot recall whether Streng or Wagner advised her to make such a call (Brant Dep. at 78, 92).

Brant's complaint prompted a conversation between Streng and Kowalski.  Streng only warned Kowalski, in general terms, not to leave children on the toilet too long (Streng Dep. at 97–100).  Neither Streng nor Wagner took further action.  To Brant, "[n]othing changed" (Brant Dep. at 20).

In March 2004, Brant again contacted Streng with complaints about Kowalski.  After a period of sick leave, Brant returned to the classroom to find Kowalski had altered J.F.'s normal schedule by integrating J.F. into classroom activities with the other children -- previously, J.F. worked alone with Brant.  Brant objected to Kowalski's decision, explaining J.F. was "a creature of habit, [and] was used to working one-on-one with [Brant]" (*id*. at 79).  After receiving Brant's call, Streng called Carol Burnsworth, North Point Director of Special Education (Doc. 90 at ¶ 19).  Together with Kowalski, Streng and Burnsworth amended J.F.'s Individualized Education Program ("IEP") so that he would be "able to have classes with more children and not be isolated in his learning" (Streng Dep. at 89).

6

*See also id.* at 104 (explaining J.F.'s mother's goal was to have J.F. "integrated back into a classroom setting in public school").

### Brant Complains to Streng and Wagner in May 2004

In May 2004, Brant called Streng at home for a third time, "and mostly she said she thought [Kowalski] was losing it, that she was being mean to all the kids.  So when I asked her to describe mean, she said that she was losing her temper, that she was obsessed with potty training again," and was using the Rifton chair as punishment (*id.* at 105).  *See also* Streng Dep. Exh. J, at 285.  Streng again reminded Brant of her child-abuse reporting obligations (Streng Dep. at 105).  Streng then contacted Fogg -- Brant told Streng that Fogg "was concerned as well" (*id.*).  Fogg told Streng she had no concerns about Kowalski's classroom conduct (*id.* at 105–06).

The May 2004 complaints eventually reached Wagner shortly after Brant's call to Streng.  Brant testified that she visited Wagner's office (Brant Dep. at 20).  Wagner and Streng instead claim that Streng called Wagner, relaying the substance of Brant's May 2004 phone call (Doc. 109, Wagner Dep. at 15–16; Streng Dep. Exhs. I–J, at 284–85).

### Brant Complains to Lally in June 2004

On June 18, 2004 (Doc. 90 at ¶ 87), after the 2003-04 school year ended, Brant complained to Lally and McCarthy about Kowalski's classroom conduct (Brant Dep. at 21) (paragraph break omitted):

> I said, well, I guess you know why I'm here [*i.e.*, her prior complaints to Streng and Wagner] and [Lally] didn't seem to know why I was in there, and I said you have not heard about what's been going on at the church and he said no.  So I told him and I told him I went to [Streng] and I told him I went to [Wagner] and he led me to believe that he didn't really know anything about it.  And then he asked me if I went to Children's Services and I said no, and he said, well you better get there.

Lally recounts that Brant told him of alleged misconduct with respect to each of the Plaintiff Children (Lally Dep. at 78–81).  Brant described Lally as angry: He "got all up in my face," and though he did not threaten her, Brant became concerned that she would be disciplined for failing to report Kowalski to children's services or law enforcement (Brant Dep. at 21).  In conflict with Lally's recall (Lally Dep. at 82–83), Brant states she did not tell Lally she had previously filed a children's services complaint; in fact, she claims Lally asked her "why didn't you call Children's Services"? (Brant Dep. at 21).  Brant visited Huron County Children's Services after leaving Lally's office (*id.* at 22).  Later, she spoke with a Norwalk Police Department detective.  She prepared statements for both agencies, detailing the extent of the alleged abuse (*see* Brant Dep. Exhs. K–L, at 287–92).

**The Alleged Abuse**

 Prior to June 2004, record evidence shows that Brant contacted Streng and Wagner on three occasions: (1) in November 2003, when she relayed how Kowalski had left J.F. alone in the bathroom, restrained in the Rifton potty chair with the lights off; (2) in March 2004, when she complained about J.F. being included in group activities; and (3) in May 2004, when she "probably" told Streng that Kowalski had "yelled" at R.G., placed J.J. in the Rifton chair as punishment, and left "J.F. on the toilet too long" (Brant Dep. at 79).  On June 18, she now revealed to Lally, for the first time, the full extent of the alleged abuse she claims to have witnessed.

*Kowalski's Treatment of R.G.*

R.G. "was a handful and . . . a spitter" (Brant Dep. at 17).  He was "energetic, loved to be defiant[,]" and to spit and bite (*id.*).  In February 2004 (Doc. 90 at ¶ 60), Brant claims that she discovered Kowalski had "bound and gagged" R.G. on a gurney placed in the Church's "main hallway."  R.G. lay on the gurney, with the head of the gurney inclined "maybe a fo[u]rth of the way up." R.G.'s hands were "tied behind him but they were out and around the back of" the gurney so that

he could not leave the gurney.  R.G. had a "gag in his mouth"; a bandana had been tied around his head, and "something [was] in his mouth so that he couldn't spit" (*id*.).  Brant "said, oh my God, and . . . walked away" (*id*.).  *See also id.* at 85.  Brant believes R.G. was bound and gagged as "punishment" for spitting (*id*. at 98).  *See also id.* at 17 ("Now, I did ask her what are you doing and she said because he won't stop spitting.").

Kowalski flatly denies Brant's version of events.  Kowalski testified that she "just put the bandana [that R.G. was then wearing loosely around his neck, and to which was attached a "chewy," a device for a child like R.G. with "sensory and oral needs"] up around his mouth."  She held the bandana in front of (but did not insert any object into) R.G.'s mouth.  She held the bandana in front of his mouth only for as long as it took her to say "no spit, no spit."  R.G. was not bound at the wrists, or tied to any object; he was standing (Kowalski Dep. at 69–74, 90).

Kowalski also placed R.G. in a Rifton chair, "[m]ore than one but less than five" times (Fogg Dep. at 117), without permission of R.G.'s mother (Doc. 112-3).

### *Kowalski's Treatment of J.J.*

J.J. was "a big girl" with balance and coordination difficulties (Brant Dep. at 44).  J.J. was unable to use the bathroom on her own; classroom staff had to "help with her pants" and other physical tasks (*id*.).  Brant testified that "once [or] twice a week," Kowalski "would take [J.J.] into the bathroom, put her on the potty, and take a belt and strap [J.J.] in" by looping the belt behind the toilet tank (Brant Dep. at 100).  Kowalski explains the belt was a men's pants belt which she brought from home (Kowalski Dep. at 102–03).  Kowalski would buckle the belt either behind the toilet tank or at J.J.'s midsection (Brant Dep. at 99).  *See also* Fogg Dep. at 120–27 (explaining that "every day, . . . three times a day[,]" J.J. would be belted to the toilet in this fashion).  J.J would be strapped to the toilet for twenty to twenty-five minutes (Brant Dep. at 84).

Brant claims J.J. "could [] support herself on a toilet without falling off," that she never saw J.J. "tilt" while sitting on the toilet, and that J.J. only fell while running (*id*. at 44).  In Brant's view, Kowalski did not use the belt to prevent J.J. from falling off the toilet.  Rather, the belt was part of Kowalski's "obsessiveness with potty training," intended to prevent J.J. from leaving the toilet (*id*. at 16).  Without the belt, J.J. "would stand up and tinkle all over the floor, all over herself" (Kowalski Dep. at 104).  Kowalski did not believe J.J. was capable of being potty-trained; she instead appears to have used the belt to ensure that, because J.J. "continuously urinat[ed]" and lacked the ability to control her bathroom use, she would urinate while on the toilet and not while standing up (*id*. at 113–14).  Fogg testified that J.J. usually would be in view of some classroom staff while she was belted to the toilet (Fogg Dep. at 126–27).

### *Kowalski's Treatment of N.D.*

N.D. was "very tiny" (Brant Dep. at 100), and, at six-years-old in 2003-04, the youngest of the Plaintiff Children (Doc. 90 at ¶ 45).[1]  Brant claims that "just about every day" Kowalski "had [N.D.] on the potty in front of the other kids.  When we ate lunch she would pull up a little chair, [N.D.] would sit on the potty and eat [her] lunch off the seat of the chair" (Brant Dep. at 15).  In this posture, N.D. would be exposed to the other children, with her "bottoms," or pants, off (*id*. at 45).  N.D. sometimes remained on the potty for "a fourth of the [school] day" (*id*. at 15).  Brant claims that Kowalski once "felt that she had to run around and show all of us how large" one of N.D.'s successful bowel movements had been (*id*. at 16).

---

[1]

The parties have stipulated to R.G. being older than N.D. during the relevant time periods (Doc. 90 at ¶ 43).  That stipulated age places R.G.'s birth date in roughly 1993 or 1994.  His educational records, however, suggest a later birth date (*see, e.g.*, Doc. 99-4 at 1).

Fogg admits this toileting-while-eating behavior occurred "multiple times."  She states N.D. was placed behind "a partition to screen her partially from the other kids where [the other kids] were sitting," but concedes that other students could have seen N.D. on the potty if they simply walked around the partition (Fogg Dep. at 127–29).  A therapy supervisor -- one of a handful of other child care professionals who occasionally visited the Church -- alerted Streng to this practice between March and May 2004; Streng states she spoke with Kowalski about this practice (Streng Dep. at 106–07).

### Kowalski's Treatment of J.F.

As noted above, Brant claims Kowalski placed J.F. in the Rifton potty chair, in the bathroom, with the door closed, the lifts off, and the water running for an extended period of time.  In addition, Brant heard Kowalski joke about J.F.'s genitals in some fashion -- "either the size of [his penis] or something" (Brant Dep. at 16, 91).  "I remember I thought [the joke] was extremely inappropriate.  Did I say anything to her?  No." (*id*. at 91).  Brant reports Kowalski made similarly inappropriate comments about J.F.'s pubic hair (*id*.).

### Kowalski's Alleged General Abusive Practices

So far, this Court has identified allegations of inappropriate conduct, supported by admissible evidence, that are specific to each of the Plaintiff Children.  Brant further testified that Kowalski used certain classroom techniques on all of the children, which Brant found to be inappropriate and eventually reported to Lally, children's services, and local law enforcement.

First, Brant "repeatedly" observed Kowalski "reach down and grab" a child's face with her index finger and thumb, squeezing either side of the Plaintiff Children's mouth and pointing their face to Kowalski's (*id*. at 18).  Second, "[i]f the children weren't staying on task or they weren't . . .

11

focusing[,] or they did whatever [Kowalski] thought needed a reprimand, she would have the children fold their arms in front of them [on a desk] and then she would force [the child's] head down on [his or her] hands, and if their head came back up she would put their head back down again" (*id*.).  At times, children would cry or "make noises [indicating] that they didn't like being" held down (*id*.).

Finally, Plaintiffs submit the affidavit of Tarina Oglesby ("Oglesby"), whose child, G.S., was Kowalski's student during the 1993-94 school year (Doc. 112-1 at ¶ 2).  G.S. was a special needs student.  Kowalski "cut G.S.'s hair for no reason" (*id*. at ¶ 4).  Oglesby claims "based on my observations of, and interactions with her, [] Kowalski had an obsession with toileting," but provides no further detail on this point (*id*. at ¶ 5).  Kowalski would change G.S. into spare clothes "because she thought he did not need to be dressed 'so nice'" (*id*. at ¶ 6).  Upon learning Oglesby was pregnant, Kowalski stated "Oh my god -- you're going to consider chromosomal testing this time, aren't you?," an apparent reference to the possibility that Oglesby's next child would also be disabled (*id*. at ¶ 7).  Oglesby reported only the chromosonal-testing comment to North Point; Kowalski eventually apologized, and Oglesby pulled G.S. from North Point schools (*id*. at ¶¶ 8–9).  No record evidence shows that a North Point employee was aware of Oglesby's complaint, and Kowalski did not recall it during her deposition.

Plaintiffs' expert witness, Dr. Helen Malone, opines that a "reasonably prudent person" would not have (for example) restrained R.G. in the manner described above or used a men's belt to tie J.J. to a toilet (*see generally* Doc. 112-2).  Aside from the red marks left on some children's faces from Kowalski's physical controls, and testimony that some of Kowalski's methods caused the Plaintiff Children to cry, Plaintiffs point to no record evidence that any of the Plaintiff Children suffered

physical or psychological injury because of the alleged abuse, or that they suffered development setbacks because of how they were treated during the 2003-04 school year.

### Brant's Understanding of Her Reporting Obligations

Brant knew she was a mandated child abuse reporter (Doc. 90 at ¶¶ 22–24).  But she understood her child abuse reporting obligations not to run outside of North Point to children's services or local law enforcement, but instead to her "supervisors" (Brant Dep. at 90).  She claims she only became aware of the reporting obligations imposed by state law when, on June 18, 2004, Lally told her to contact children's services (*id*. at 91).

In not reporting Kowalski's classroom behavior to persons outside of North Point, Brant explains she followed the Concerns Resolution Policy, which she understood to require reporting up the "chain of command" (*id*. at 106).  Her understanding on this point is colored by an earlier encounter with North Point administrators.  Brant's first North Point assignment was at "the Armory" (*id*. at 6), where North Point leased classroom space.  "[T]he noncommissioned officer" managed the Armory for the entity that leased space to North Point (Doc. 96, McCarthy Dep. at 68).  Brant complained directly to McCarthy about the Armory classroom facilities "and the noncommissioned officer in charge of the Armory[, who] was not allowing students or the teachers to use various parts of the facilities" (*id*.).  Brant did not allege any child abuse on the noncommissioned officer's part.  Rather, Brant complained that the noncommissioned officer was "tramping on teacher territory" by attempting to impose order on unruly classrooms that were otherwise not well-managed by Armory teachers (*id*. at 73–75).  Though he found other issues at the Armory, McCarthy concluded Brant's complaints were untrue or embellished (*id*. at 71–72, 76).  Brant was told "you jumped the gun [by] call[ing] Dan McCarthy out at the Armory, you didn't follow the chain of command."  At later in-

13

service meetings, "Dan and Bill . . . [were] adamant, follow your handbook, read your handbook, go through the chain of command[,] and that's what I did" (Brant Dep. at 106).

### State and Local Agencies and North Point Investigate

After Brant met with Lally and McCarthy, Lally phoned Aaron Voltz ("Voltz") at Erie County Children's Services to ask Voltz to begin an investigation and contact Huron County, where the Church was located, to see if any one had complained about Kowalski (Lally Dep. at 105, 108–09). Voltz did not respond until July 22, 2004 (*id*. at 109).  In the interim, Huron County or the Norwalk Police Department contacted Lally (*id*. at 110).  Lally spoke with a select North Point staff, but otherwise "let the investigation take its course" (*id*. at 119).  No criminal charges resulted (*id*. at 121).

Thereafter, ODE began an investigation to determine whether, based on Brant's allegations, Kowalski would be disciplined (*id*. at 123).  Midway through that investigation, ODE informed Lally that North Point was "free to conduct [its own] investigation."  Prior to that time, North Point had held off "because we don't want anyone to say we've interfered" with the criminal or ODE investigations (*id*. at 130–31).  Lally assigned McCarthy to the investigation (*id*. at 131).  McCarthy spoke with several North Point employees who "were primarily in [Kowalski's] room."  He did not speak with Brant or Kowalski, who an ODE investigator was already scrutinizing (McCarthy Dep. at 130–33,140).  He "ask[ed] . . . individuals point blank if they had ever observed or suspected child abuse in that classroom" by Kowalski (*id*. at 142).  All said "no."  (*id*.).

North Point placed Kowalski on paid leave for the 2004-05 school year, pending conclusion of the criminal and administrative investigations (Doc. 90 at ¶ 96).  In March 2005, Kowalski entered into an ODE consent agreement, which imposed additional training requirements.  For two years, Kowalski and North Point reported to ODE on a biennial basis on Kowalski's performance (*id*. at ¶

14

97–98).  ODE did not terminate or suspend Kowalski's teaching license (*id*. at ¶ 99).  Kowalski returned to regular employment during the 2005-06 school year, though not as a classroom teacher (Kowalski Dep. at 51–52).  She fulfilled the ODE consent agreement in July 2007 (Doc. 99-3 at 73), and was still employed by North Point as of May 2013 (Lally Dep. at 39; Doc. 99-3 at 8).

STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." *Id*.  When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court is not permitted to weigh the evidence or determine the truth of any matter in dispute -- it may not, for instance, believe one witness' account of the alleged abuse, and discount another witness' account.  Rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

DISCUSSION

**Theories of Liability**

Plaintiffs sue actors at all levels of the North Point administration, including the municipality itself.   As a result, Plaintiffs' theories of liability differ, based on a Defendant's actions, responsibilities, and knowledge (if any) of the alleged abuse prior to Brant's June 18, 2004 report. Briefly stated, Plaintiffs allege (1) one Defendant (Kowalski) directly abused their children, (2) other Defendants (Streng and Wagner) failed to prevent known abuse from occurring, and (3) still other Defendants (North Point, Lally, and McCarthy), ignorant of the abuse, are liable because policies they

15

adopted or enforced (or failed to adopt), or customs or practices they allowed to develop, contributed to Kowalski's conduct.

### Res Judicata

However, this Court cannot proceed to the merits of J.F.'s claims because claim preclusion bars those claims. In 2006, J.F.'s parents, Plaintiffs in this action, filed a complaint ("the 2006 action") in the Huron County Court of Common Pleas against Kowalski and North Point ("the Huron County Defendants"). The 2006 action raised negligence and intentional abuse claims (Doc. 4-1 at 1–3). In 2007, the J.F. Plaintiffs voluntarily dismissed the 2006 action (*id*. at 4). They refiled the action in 2008 ("the 2008 action") (Doc. 4-2 at 1–3).

Thereafter, the J.F. Plaintiffs' counsel died. Now without counsel, the J.F. Plaintiffs failed to attend a status conference. In January 2009, the Huron County Defendants filed a motion to dismiss for failure to prosecute (Doc. 108-1 at 2). The next month, the court of common pleas issued an order, requiring, by March 2009, the J.F. Plaintiffs to "communicate their desire to prosecute the case to the court by and through the appearance of counsel or otherwise" (*id.*) (quotation marks omitted). Because the J.F. Plaintiffs failed to contact the court, in March 2009 the court of common pleas dismissed the 2008 action with prejudice (*id*.).

In February 2013, the J.F. Plaintiffs filed an Ohio Civil Rule 60(B)(1) "motion to reinstate the dismissal as being without prejudice" (*id*. at 3). The court of common pleas denied the motion, noting that relief under the Rule was time barred (*id*.). In March 2014, the Ohio court of appeals affirmed, agreeing that the Rule 60 motion was untimely and finding the J.F. Plaintiffs "pointed to no specific facts which would rise to the level of 'extraordinary circumstances' to warrant relief under [Ohio Civil Rule] 60(B)(5)" (*id*. at 7–8).

This Court must give the state court judgment the same preclusive effect it would have in an Ohio court. 28 U.S.C. § 1738. *See also Dubuc v. Green Oak Twp.*, 312 F.3d 736, 744 (6th Cir. 2002). To determine the effect of that judgment, this Court applies Ohio law. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

In Ohio, a prior judgment is res judicata in a subsequent proceeding if: (1) there is a final, valid decision on the merits by a court of competent jurisdiction; (2) there is a second action that involves the same parties, or their privies, as the first action; (3) the second action raises claims that were or could have been litigated in the first action; and (4) the second action arises out of a transaction or occurrence that was the subject matter of the first action. *Portage Cty. Bd. of Commrs. v. City of Akron*, 109 Ohio St. 3d 106, 123 (2006). "[A] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava v. Parkman Twp.*, 73 Ohio St. 3d 379, 382 (1995). Plaintiffs acknowledge that the March 2009 dismissal was a "valid decision rendered by a court of competent jurisdiction" (Doc. 112 at 28). Plaintiffs cannot dispute that the 2008 action and this case arise out of the same transaction or occurrence, namely, the 2003-04 school year at the Church.

However, Plaintiffs note that Lally, McCarthy, Wagner and Streng were not named as defendants in the 2008 action (*id.*). No matter. Because North Point was a defendant in the 2008 action, additional defendants, named for the first time in a second action, are in privity with defendants in the first suit if the additional defendant's liability is premised solely on actions he or she took as part of an official duty. *See Lisboa v. City of Cleveland Heights*, 2013 U.S. Dist. LEXIS 131129, at * 10 (N.D. Ohio 2013). All claims against Lally, McCarthy, Wagner, and Streng relate

17

to actions each took (or failed to take) as North Point employees. Plaintiffs also note that the 2008 action did not include a Section 1983 claim (Doc. 112 at 28).  Section 1983 claims can be brought in state court, *Haywood v. Drown*, 556 U.S. 729, 735 (2009), and Plaintiffs do not otherwise show why federal claims could not have been brought in the 2008 action.  J.F.'s claims are barred.

*  *  *

**Kowalski's Motion**

Kowalski argues the remaining Plaintiffs' federal-law claims fail against her for two reasons. First, Kowalski argues the Plaintiff Parents were required to exhaust administrative remedies available to them under the Individuals with Disabilities Education Act ("IDEA").  Because they did not exhaust IDEA remedies, Kowalski argues Plaintiffs may not now assert Section 1983 claims designed "to obtain relief that is also available under the IDEA" (Doc. 99 at 11) (quoting *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 915 (6th Cir. 2000)).  Second, Kowalski argues that even if the IDEA's exhaustion requirement does not bar Plaintiffs' Section 1983 claims, qualified immunity does (Doc. 99 at 13).  This Court accepts only the second argument.

**IDEA Failure to Exhaust**

The IDEA exhaustion requirement contained in 20 U.S.C. § 1415(I) presumptively applies to Plaintiffs' Section 1983 claims if any of those claims "allege[] injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies." *S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008) (quoting *Robb v. Bethel Sch. Dist. #403*, 308 F.3d 1047, 1048 (9th Cir. 2002)).  Given the broad scope of the exhaustion requirement, at least some of the claims center on injuries that could have been addressed, at least in part, by IDEA administrative processes (*see, e.g.*, Doc. 99-2 at 7, 87) (correspondence from J.J.'s parents to North Point, requesting various adjustments

to J.J.'s IEP and access to educational records after Norwalk police and Huron County Children's Services informed J.J.'s parents of the alleged abuse).

Even so, exhaustion would be futile in these circumstances.  *See Covington*, 205 F.3d at 916–17.  Though it is not clear where J.J., R.G., and N.D. are in their educational placements, at the time Plaintiffs filed this action in state court more than nine years had passed since Brant reported the alleged abuse.  The youngest of the Plaintiff Children is now between sixteen- or seventeen-years-old, the eldest, twenty-one-years-old.  Each child has progressed far beyond the educational stage at which the abuse occurred, and "his [or her] injuries are wholly in the past, and therefore money damages are the only remedy that can make him [or her] whole," assuming those injuries are legally compensable. *Id.* at 917.  The IDEA does not bar Plaintiffs' federal claims.

### Federal Qualified Immunity -- Standard

The doctrine of qualified immunity shields from civil liability government officials who perform discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (quotation marks omitted).  When raised by way of summary judgment, qualified immunity must be denied when: (1) facts taken in the light most favorable to the plaintiff show a constitutional violation, and (2) the relevant constitutional right was "clearly established" at the time of the defendant's alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  When evaluating established law, this Court first looks to the decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, then to decisions of district courts within this Circuit, and, finally, to decisions of courts in other circuits.  *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).

Plaintiffs' Section 1983 claims seek to vindicate their right to "be free of physical abuse at the hands of state actor(s)" and to enjoy "personal security and bodily integrity in the educational setting" (Doc. 1-1 at ¶ 123).  Sixth Circuit precedent clearly defines the standard this Court must apply to Plaintiffs' Section 1983 claim: the substantive due process "shocks the conscience" standard.  *See, e.g.*, *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987).  *See also Nolan v. Memphis City Sch.*, 589 F.3d 257, 269 (6th Cir. 2009) (applying the shocks-the-conscience standard to Section 1983 claim premised on allegations of teacher child abuse); *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 725–26 (6th Cir. 1996) (applying the shocks-the-conscience standard even though "the record fail[ed] to reflect any legitimate disciplinary purpose occasioning the slap to" a student).  *See also Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010) (noting, in the context of an excessive force claim, substantive due process poses "[a] substantially higher hurdle" than the Fourth Amendment objective reasonableness standard) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001)).

Therefore, this Court must examine whether, as to each child with remaining claims, "the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Webb*, 828 F.2d at 1158 (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)).  "In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Glick*, 481 F.2d 1028,

20

1033 (2d Cir. 1973) (cited in *Webb*, 828 F.2d at 1158). While some forms of child abuse may shock the conscience under *Webb*, not all child abuse meets that high threshold. *See, e.g., Jackson v. Sumner Cnty. Bd. of Educ.*, 2011 U.S. Dist. LEXIS 2806, at **14–15 (M.D. Tenn. 2011) (granting summary judgment for defendant, noting a teacher "shoved [the student] against a bookshelf, squeezed his face painfully tightly on at least one occasion, forcefully 'slammed' him into a chair, and 'yanked' him away from the drinking fountain," acts that "while potentially abusive, did not cause severe physical harm[,]" were not malicious, and thus "do not shock the conscience").

In the absence of a pedagogical purpose behind an act, it is more likely that a jury could find the need to employ the various tactics "was so minimal or non-existent that the alleged [abuse] w[as] a brutal and inhumane abuse of [her] official power, literally shocking to the conscience." *Webb*, 828 F.2d at 1159. *See also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (concluding a jury could find a constitutional violation "because [merely for forgetting] to bring a pencil to class, [a teacher] grabbed [a student] and slammed her head against the blackboard[ and] . . . then threw her on the ground and choked her for approximately one minute. As a result, [the student] suffered petechia and contusions on her neck. Later, [the student] also exhibited symptoms consistent with post-traumatic stress disorder."). By contrast, conduct that may be tortious under state law is less likely to rise to the level of a constitutional tort if undertaken for disciplinary or other pedagogical reasons. The fact that the Plaintiff Children were developmentally-disabled bears on whether the amount of force Kowalski used amounts to a substantive due process violation. *See G.C. v. Sch. Bd. of Seminole Cnty.*, 639 F. Supp. 2d 1295, 1305 (M.D. Fla. 2009) (collecting cases).

"Courts that have permitted substantive due process claims to proceed to trial customarily require the student to sustain dramatic physical injuries," such as the loss of an eye, broken teeth, or

21

extended hospitalization connected to teacher abuse.  *Ross v. Lamberson*, 873 F. Supp. 2d 817, 820 (W.D. Ky. 2012) (collecting cases).  *See also Shinn v. Detroit Public Schs.*, 2011 U.S. Dist. LEXIS 10140, at ** 20–22 (E.D. Mich. 2011) (denying summary judgment on qualified immunity grounds when, after telling an epileptic student "I never liked you anyways," a teacher either shoved the student to the ground or released her hold on the student, causing the student to fall, hit a chair and then the ground, triggering a seizure).  *Cf. Nolan*, 589 F.3d at 269–70 (affirming denial of motion for new trial on Section 1983 claim, noting plaintiffs "failed to produce medical evidence that any physical injury resulted from the paddlings" and "scant evidence of significant psychological injury stemming from the paddling").  The shocks-the-conscience standard therefore is "quite different than a claim of assault and battery under state tort law."  *Saylor v. Bd. of Educ. of Harlan Cnty., Ky.*, 118 F.3d 507, 514 (6th Cir. 1997) (quotation marks omitted).  "'In resolving a state tort claim, decision may well turn on whether ten licks rather than five were excessive, so that line-drawing this refined may be required. But substantive due process is concerned with violations of personal rights of privacy and bodily security of so different an order of magnitude that inquiry in a particular case simply need not start at the level of concern those distinctions imply.'"  *Webb*, 828 F.2d at 1158 (quoting *Hall*, 621 F.2d at 613) (internal citation omitted).

### Federal Qualified Immunity -- Application

None of the incidents of alleged abuse passes *Webb's* high threshold; therefore, summary judgment is appropriate for all federal claims against Kowalski.

*R.G.*: Brant's testimony establishes that Kowalski bound and gagged R.G. as "punishment" for, or as a response to, R.G.'s spitting.  In that respect, Kowalski restrained R.G. for pedagogical purposes -- to stop him from spitting.  There are no facts in the record suggesting that Kowalski

restrained R.G. in this manner out of malice or sadism, or that she struck R.G.  Brant could not recall how long R.G. remained bound and gagged.  No evidence suggests R.G. suffered any physical or psychological injury as a result of being restrained.  If in fact Kowalski acted as Brant testified, she almost certainly engaged in child abuse.  But a jury could not find her conduct shocks the conscience.

*J.J.*:  Relying on Brant and Fogg's testimony, Plaintiffs have shown a jury could find Kowalski daily strapped J.J. to a toilet with a men's belt, not to prevent J.J. from falling off the toilet but instead to prevent J.J. from leaving the toilet.  But record facts do not show this inappropriate approach to toilet training injured J.J., or that Kowalski used the belt for malicious or sadistic purposes; instead, as with other conduct, Kowalski was here "obsessively" pursuing potty training.  And even though J.J.'s IEP did not identify that activity as a permissible one, it still served a pedagogical function.

*N.D.*:  Plaintiffs produce sufficient evidence from which a jury could find Kowalski required N.D. to potty train in view of other students while N.D. ate lunch.  According to that evidence, N.D was exposed while she potty trained and ate.  Kowalski's toilet training approach was unsanitary, and highly offensive to the dignity of a severely disabled child.  But as a legal matter, it does not shock the conscience.  For one, Kowalski's toilet training approach was undertaken for a pedagogical purpose: the undisputed evidence shows Kowalski fed N.D. while N.D. toileted in an effort to relax N.D. and aid in use of the toilet.  No evidence suggests that Kowalski required N.D. to toilet in view of other children, or while eating her lunch, because of some malicious or sadistic motive.  Nor does the evidence show Kowalski applied any particular force to N.D. in the course of toilet training.  Finally, there is no evidence that N.D. suffered physical or psychological injury as a result of Kowalski's inappropriate toilet training technique.

23

**Conduct common to all children**: Finally, Plaintiffs produce evidence that Kowalski would regularly use two techniques with all students.  First, Kowalski would use "physical controls" to direct a child's attention to herself; Kowalski would cup the chin and cheeks of a child, or more forcefully, pinch the child's cheeks, pointing the child's face at her own.  Brant testified that this physical control sometimes left red marks on the children's faces.  Second, while a child sat in a Rifton chair or at a desk, Kowalski would instruct (or physically force) the child to cross his or her arms in front of them on the Rifton chair tray or desk.  Kowalski would then instruct (or physically force) the child to put his or her head "down," so that the child's forehead rested on his or her arms.  If the child attempted to leave this posture, Kowalski would hold the child's head down, forcing it to rest on the child's arms.  Not surprisingly, the children would become upset, and struggle against Kowalski or cry.

Again, neither tactic shocks the conscience.  Both were employed to keep a child on task (the face hold) or to calm a child (holding the child's head to a Rifton chair tray or table).  There is no evidence, only speculation, that Kowalski acted malicious or sadistically in using either method.  The evidence instead shows Kowalski employed what seems to be a clearly inappropriate approach to keeping severely autistic children focused.  Finally, there is no evidence that either method resulted in the type of severe injury that marks most viable teacher-abuse claims brought under Section 1983.  Brant testified that Kowalski's cheek-pinches left red marks on some children.  But on this record, a jury could only speculate as to whether those red marks were indicative of severe, long-lasting injury (or any injury at all).  Likewise, though record evidence shows the children did not like Kowalski's head-down method, no record evidence shows that that method injured any child.

Considered individually or cumulatively, Plaintiffs fail to identify material disputes of fact sufficient to send any of Plaintiffs' Section 1983 claims, leveled against Kowalski, to a jury.  "[N]ot

every state law tort becomes a federally cognizable 'constitutional tort' under [Section] 1983 simply because it is committed by a state official." *Hall*, 621 F.2d at 613.  Summary judgment with respect to Plaintiffs' Section 1983 claims says nothing about the viability of Plaintiffs' state-law tort claims. The shocks-the-conscience standard is a demanding one, rarely satisfied if (as here) a plaintiff fails to produce any evidence that the abusive teacher acted with malicious or sadistic intent -- or, as the case law phrases the inquiry, "for the very purpose of causing harm." *Johnson*, 481 F.2d at 1033. Brant's testimony that Kowalski was "obsessive" about toilet training reflects an "unwise excess of zeal," not malice or sadism. *See Lillard*, 76 F.3d at 725 (quotation marks omitted).  Nor is the shocks-the-conscience standard met on this record, which lacks an indication that any of Kowalski's actions caused any child severe injury (or any injury, for that matter).  The Plaintiff Children, of course, are non-verbal.  But personal physicians or their records, medical experts retained for purposes of this litigation, or the Plaintiff Parents could offer insight on the effect or likely effect of Kowalski's actions.  Plaintiffs point to no such evidence, and this Court's careful review of the summary judgment record reveals none.

*  *  *

**The North Point Defendants' Motion**

Drawing all inferences from record facts in Plaintiffs' favor, Plaintiffs identify no actions by Kowalski that shock the conscience.  That holding alone is enough to defeat Plaintiffs' claims against the North Point Defendants.  But Plaintiffs further fail to show that any of the North Point Defendants are responsible for Kowalski's conduct, even had any of Kowalski's conduct amounted to a constitutional violation.

**North Point's Liability**

Plaintiffs must show a North Point policy, custom, or practice "caused" the alleged constitutional deprivations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "A plaintiff can [show] an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  Plaintiffs argue North Point is liable in each of these ways.

*Unlawful Policy*: Neither the Child Abuse Policy, nor the Concerns Resolution Policy, nor an employee handbook that includes both policies amounts to an unlawful policy for purposes of municipal liability.  The Concerns Resolution Policy itself states "*this section will be waived when it conflicts with provisions in local, state, and federal law and/or Ohio Department of Education guidelines*" (Doc. 107-2 at 3) (emphasis in original).  And the Child Abuse Policy notes "*failure to follow this directive is a violation of state law*" (*id*. at 2) (emphasis in original).  While perhaps North Point could have more carefully drafted these policies to expressly state that the Child Abuse Policy supersedes the Concerns Resolution Policy, that fact does not make the Concerns Resolution Policy an unlawful one.  Likewise, Plaintiffs' objection to the Child Abuse Policy's failure to present an "objective definition" of child abuse assumes such a definition exists.  The Child Abuse Policy correctly notes that "[a]buse can take many forms," and then provides an illustrative list of child abuse, ranging from sexual abuse to neglect (*id*.).

Because respondent superior is not a basis for municipal liability, and because the Child Abuse Policy and the Concerns Resolution Policy are "facially innocuous," Plaintiffs must "establish that

an official policy was promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 & n.2 (5th Cir. 2003) (quotation marks omitted). Plaintiffs' claim that Lally "*affirmatively* established [policies] at North Point which were *designed* to limit transparency and keep [North Point administrators] *deliberately ignorant* as to what was happening to the children in Kowalski's classroom" is utterly unsupported by record evidence (Doc. 114 at 24) (emphases added). A reasonable person would understand the purpose of each policy: known or suspected child abuse must be reported to law enforcement or children's services. Employee complaints about teachers are to be reported up the chain of command. If the complaint about a teacher bears on known or suspected child abuse, the Child Abuse Policy controls (not to mention coterminous provisions of state law), and the child-abuse complaint must be reported externally. Plaintiffs offer only Brant's unreasonable reading of the Child Abuse Policy and its interaction with the Concerns Resolution Policy, a reading that is hardly an obvious consequence of the two policies' phrasing. Moreover, even accepting that a reasonable person could read the Concerns Resolution Policy to somehow override the Child Abuse Policy, Plaintiffs fail to show, as they must, that these "conflicting mandates" were the "moving force" behind Kowalski's conduct. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

   ***Ratification***:  A municipality incurs liability under a ratification theory if "the allegedly unconstitutional decision is initially made by a subordinate official, [and t]hen that decision is appealed to and affirmed by an official with final authority over a matter." *Arendale v. City of Memphis*, 519 F.3d 587, 602 (6th Cir. 2008). A ratification theory of liability is not so broad as to impute liability to a municipality "if a policymaker defends his subordinates and those subordinates

are later found to have broken the law." *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009) (quoting *Coon v. Ledbetter*, 780 F.2d 1158, 1161–62 (5th Cir. 1986)).  Plaintiffs produce no evidence that a North Point policymaker "expressly ratified" Kowalski's inappropriate conduct, *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993), only statements from Kowalski that she felt North Point administrators were supportive of her during the state and local investigations. (Doc. 114 at 9 (citing Kowalski Dep. at 123) ("They were supportive of me")).

> **Failure to Train**: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, --- U.S. ---, 131 S. Ct. 1350, 1359 (2011). *See also Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2005) (identifying elements of a failure-to-train theory). Deliberate indifference in the context of a failure-to-train theory may exist in one of two cases: the (1) "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction" ("single-incident liability"), or (2) a failure to act in response to "repeated complaints of constitutional violations" by North Point staff ("multiple-incident liability"). *Ellis*, 455 F.3d at 700–01 (quotation marks omitted). Plaintiffs base their failure-to-train theory on North Point's failure to "train its employees in recognizing child abuse" (Doc. 114 at 16). North Point employees lacked an "objective definition" of child abuse (*id*. at 6). They also were not trained on the use of Rifton chairs as classroom restraints (*id*. at 16).

Plaintiffs do not present sufficient evidence to show that single-incident liability applies to this case; they simply assert that it does. *See Connick*, 131 S. Ct. at 1361–64 (describing single-incident liability as "rare" and a "hypothetical example" of failure-to-train liability, applicable only in cases where "the unconstitutional consequences of failing to train could be . . . patently obvious"). North Point trained its employees on the Child Abuse Policy, which tracked state law. Thus, Plaintiffs'

28

challenge to instruction in that policy amounts not to a claim that there was a total absence of child-abuse-reporting training, but that the training was not good enough or lasted long enough (*see* Doc. 114 at 16 (noting that North Point Defendants "fail to mention [in their opening brief] that *the time it devotes to this child abuse and prevention training was 'probably five minutes'*")) (emphasis in original). Likewise, Plaintiffs have failed to demonstrate that state-licensed special education teachers or their aides "utterly lack" the ability to identify child abuse or the proper use of classroom restraints. *See Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) (noting that a constitutional violation must be the "highly predictable consequence" of a complete failure to train).

Nor have Plaintiffs produced sufficient evidence to show multiple-incident liability applies to this case.  No policymaker knew of Kowalski's conduct during the school year; none of that conduct constituted a constitutional violation (much less a pattern of such violations); and Plaintiffs have not shown that the amount and type of complaints associated with Kowalski's classroom was uncommon. *Compare Campbell v. City of Springboro*, 700 F.3d 779, 783–84, 790 (6th Cir. 2012), *with Connick*, 131 S. Ct. 1360, *and Ellis*, 455 F.3d at 701, *and Thomas v. City of Chattanooga*, 398 F.3d 426, 430–31 (6th Cir. 2005).  *See also Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013). "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick,* 131 S. Ct. at 1363–64.

*Inaction*: For their inaction theory, Plaintiffs must show triable issues on four points: "(1) the existence of a clear and persistent pattern of [physical] abuse by school employees; (2) notice or constructive notice on the part of [North Point]; (3) [North Point's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [North Point] custom was the 'moving force'

29

or direct causal link in the constitutional deprivation." *Doe v. Clairborne Cnty.*, *Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996). On this record, "[i]t cannot be said" that North Point's "failure to act in . . . was the direct result of a custom in the sense that [North Point] consciously never acted when confronted with its employees' egregious and obviously unconstitutional conduct." *Id.* North Point did not have actual or constructive knowledge of events in Kowalski's classroom. Plaintiffs' inaction municipal-liability theory instead amounts to respondent superior liability.

### Supervisory Liability

Because "it is undisputed that but for the actions of [Kowalski], [the Plaintiff Children] would have suffered no injury," all claims against the individual North Points Defendants are supervisory liability claims. *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). Plaintiffs must show "active unconstitutional behavior" on the part of a supervisor, not "a mere failure to act." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotation marks omitted). *See also Clairborne Ctny.*, 103 F.3d at 513 (explaining supervisory liability does not attach to a supervisor's "sloppy, reckless, or neglectful" supervision of the subordinate whose actions cause unconstitutional harm). Plaintiffs produce no evidence that Lally or McCarthy knew of Kowalski's conduct during the 2003-04 school year. Arguments related to the adequacy of North Point's investigation *after* Kowalski had been suspended with pay for the 2004-05 school year fail to establish that Lally and McCarthy's action (or inaction) was the moving force behind Kowalski's conduct *during* the 2003-04 school year. Plaintiffs' claims against Lally and McCarthy are instead "claims against [North Point]," which fail for the reasons noted above. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005).

With respect to Streng and Wagner, Plaintiffs must show that "in light of the information the defendants possessed, the teacher who engaged in [physical] abuse showed a strong likelihood that

[the teacher] would attempt to [physically] abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students," or was tacit authorization of repeated physical abuse. *Clairborne Ctny*., 103 F.3d at 513 (internal quotation marks omitted).  "'The causal connection [between the supervisor's conduct and that of the subordinate] can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and [the supervisor] fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.'"  *City of Roseville*, 296 F.3d at 440 (quoting *Braddy v. Florida Dep't of Labor & Emp't Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)).  *See also Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 492–93 (6th Cir. 2006).  In the absence of evidence that they "directly participated" in or "encouraged" the alleged abuse, the individual North Point Defendants' liability cannot depend on "testimony [that] . . . , at best, indicates that some instances of alleged [abuse] were brought to the attention of [school] supervisory officials." *Lillard*, 76 F.3d at 727–28.

Specific evidence shows that Streng and Wagner knew of most of the alleged instances of abuse (*see* Brant Dep. at 77 (recounting November 2003 discussion with Streng), *and id*. at 79 (recounting March 2004 discussion with Streng), and *id.* (recounting May 2004 discussion with Streng)).  But that knowledge was not of an "obvious, flagrant, [and] rampant" pattern of constitutional deprivations.  There is no evidence that any of the individual North Point Defendants participated in or approved Kowalski's inappropriate conduct.  Plaintiffs "ha[ve] merely claimed that [Streng and Wagner] were aware of alleged [abuse], but did not take appropriate action."  *Poe v.*

*Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).  *See also Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003).  Streng and Wagner may have been negligent, but supervisory liability requires more.

CONCLUSION

The 2008 action bars the J.F. Plaintiffs' claims.  Further, with respect to the remaining Plaintiffs, there is no genuine dispute of material fact that Kowalski's conduct deprived any of the Plaintiff Children of substantive due process.  Nor is there a genuine dispute of material fact that any of the North Point Defendants is liable for Kowalski's conduct (assuming any part of her conduct violated the Fourteenth Amendment).

For these reasons, Defendants' Motions for Summary Judgment (Docs. 99 & 100) are granted in part and denied in part as moot.  This Court declines to exercise supplemental jurisdiction over the remaining state-law claims.  *See* 28 U.S.C. § 1367(c)(3).  Those claims are remanded to the Erie County Court of Common Pleas, the state court from which this case was removed.  *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.") (quotation marks omitted).  The parties have not completed discovery.  Moreover, given the subject matter of the remaining claims -- allegations of abuse by officials acting under color of state law -- comity considerations weigh in favor of a state court resolving those claims.

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

August 29, 2014
